IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

CAROLINE MCGRONE,                     )
                                      )
                    Plaintiff,        )
                                      )
            v.                        )        Case No.
                                      )        05-1197-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner        )
of Social Security,                   )
                                      )
                    Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Caroline McGrone seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act").  Plaintiff argues that (1) the ALJ's credibility finding is not

supported by substantial evidence, and (2) the hypothetical relied on by the ALJ did not

accurately detail all of plaintiff's impairments.  I find that the substantial evidence in the record

as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion

for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On January 9, 2002, plaintiff applied for disability benefits alleging that she had been

disabled since September 12, 2000.  Plaintiff's disability stems from depression, anxiety, obesity, a

history of back pain and strain, asthma, and diabetes.  Plaintiff's application was denied on

August 23, 2002.  On April 14, 2004, a hearing was held before an Administrative Law Judge.

On April 30, 2004, Administrative Law Judge Jan Donsbach found that plaintiff was not under a

"disability" as defined in the Act.  On November 5, 2004, the Appeals Council granted plaintiff's

request for review, and the Appeals Council remanded the case to the ALJ for further proceedings. In the meantime, on July 12, 2004, plaintiff filed another application for benefits. The Appeals Council directed that the subsequent claims be consolidated with the prior applications for hearing and decision. On March 17, 2005, a hearing was held before ALJ Guy Taylor. During the hearing, plaintiff amended her alleged onset date to February 15, 2001, due to earnings. On March 25, 2005, the ALJ found that plaintiff was not disabled.

Plaintiff filed her case in federal district court on November 28, 2005. On July 6, 2006, defendant filed a motion to reverse and remand. That motion was denied on August 9, 2006. Currently before the court is plaintiff's motion for summary judgment on her disability claims.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th

Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1985 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1985 | $    0.00 | 1995 | $16,386.25 |
| 1986 | 386.82 | 1996 | 16,243.80 |
| 1987 | 0.00 | 1997 | 4,414.76 |
| 1988 | 0.00 | 1998 | 18,598.53 |
| 1989 | 0.00 | 1999 | 25,830.90 |
| 1990 | 874.54 | 2000 | 21,056.89 |
| 1991 | 8,637.73 | 2001 | 3,047.50 |
| 1992 | 6,821.71 | 2002 | 0.00 |
| 1993 | 11,458.32 | 2003 | 0.00 |
| 1994 | 7,291.35 | 2004 | 0.00 |

(Tr. at 129-140).

**Stipulation for Compromise Settlement**

On November 5, 2001, a check was sent to plaintiff in settlement of her worker's compensation claim (Tr. at 143, 149-153). The stipulation for compromise settlement states that plaintiff made a claim, there is a dispute between the parties as to "Nature and extent, medical, future medical, TTD, future TTD". The parties agreed to a lump sum payment of $9,090.30, $2,727.57 of which went to plaintiff's worker's compensation attorney (Tr. at 149).

## B.    SUMMARY OF MEDICAL RECORDS

On August 1, 2000, plaintiff saw Fred A. Fayne, M.D., a psychiatrist (Tr. at 336-337).
Plaintiff reported a lot of conflicts about financial management and said she felt she wound up
with most of the bills even though her husband earned more than she did.  Plaintiff reported
problems sleeping and said she sometimes sits up all night watching television.  She said that she
sometimes wants to hit her husband with something.  "She describes herself as biding her time,
that since he is [24 years] older than she is that he will die before she will and then her life will
be on easy street." (Tr. at 124, 336).  "Patient describes crying spells, angry explosive outbursts,
and arguments with her husband about his spending and not paying his share of the bills.  She
will isolate herself in her bedroom and at times not go to work.  The feelings are if she does not
work, then he would have to pay the bills or lose everything."  Plaintiff was in foster care from
the age of 7 to 15.  She was treated at Western Missouri Mental Health Center at the age of 16
because of running away behavior.  Dr. Fayne performed a mental status exam.  Plaintiff was
unable to do serial seven or serial three subtractions.  Her thoughts were mildly concrete, insight
and judgment were good, her general fund of knowledge was adequate.  Plaintiff was of low
average intelligence "possibly due to educational deficiency".  His psychiatric diagnosis was:

Axis I:        Major depression severe without psychosis, and anxiety disorder
               generalized with post traumatic stress disorder issues.

Axis II:       No diagnosis.

Axis III:      Mild obesity and hypertension.

Axis IV:       Stresses related to severe marital conflicts, history of childhood
               physiological, physical, and sexual abuse, support systems.

6

Axis V:     GAF 55-60, high the past year 60[1].

Dr. Fayne started plaintiff on Tranxene [treats anxiety] daily, Zoloft [treats depression] daily, and Trazodone as needed for sleep.

Sometime in August 2000[2] plaintiff saw Fred A. Fayne, M.D. (Tr. at 335). Plaintiff was appropriately dressed and groomed. "She states that when she is not working she sleeps to avoid dealing with her husband. . . . who is sixty, and the patient is thirty-five. . . . There is ongoing fighting regarding the bills and excessive spending." Dr. Fayne increased plaintiff's Tranxene and Zoloft, and he prescribed Trazodone for sleep.

On August 31, 2000, plaintiff saw Fred A. Fayne, M.D. (Tr. at 335). She was appropriately dressed and groomed. "We discussed some of her anger with her husband who she sees as always spending money that they can't afford to spend. . . . When asked what was in the relationship to continue, she states that security and at some point, maybe he would die and leave her well off. Apparently, the husband is a retired military veteran. . . . Patient denies any suicidal or homicidal ideation although she expressed a lot of anger and at times wishes that he would die. She has been at times eating excessively. . . . She has continued to go to work. She works a lot of extra hours to make funds and then feels that he drops things on her to take care of and she gets feeling overwhelmed then angry and wants to quit, but fears she can't quit because of the situation. Now she is feeling hopeless and trapped." Dr. Fayne increased

---

[1]A Global Assessment of Functioning of 51-60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers).

[2]The date was cut off in copying.

7

plaintiff's Trazodone and increased her Zoloft. "Patient left the session feeling better."

In September 2000[3] plaintiff saw Fred A. Fayne, M.D. (Tr. at 334). Plaintiff was feeling down and angry, she had not taken her medications for three days and she had quit going to work. She was very angry with her husband. "She continued to sleep during the day and then has difficulty sleeping at night." She said she did not have any energy. "We talked about her making a conscious effort to sleep at night and stay up during the day. The patient admitted that she uses her sleep to avoid dealing with her husband and dealing with her anger and frustration with him. Her secret desire is that he will die and leave her well off. Her husband is an older gentleman. . . . She had started a GED program but has not been attending that program the last couple of months." Dr. Fayne decreased plaintiff's Zoloft and prescribed Seroquel [antipsychotic] and Effexor XR [antidepressant].

On October 2, 2000, plaintiff saw Fred A. Fayne, M.D. (Tr. at 334). Plaintiff was appropriately dressed and groomed. She continued to deal with marital conflict. "She is continuing to have some sleep difficulty. Apparently the patient does a lot of sleeping during the daytime, which we would advise against and more sleeping at night. She has missed work on occasions to get even with her husband. She says all he does is spends his money buying gadgets and things and doesn't pay attention to her. . . . I invited the patient to bring her husband to therapy to discuss some of the marital conflicts, which to date she has not for one reason or another".

_____

[3]The date was cut off in copying.

On November 7, 2000, plaintiff saw Fred A. Fayne, M.D. (Tr. at 333). Plaintiff was appropriately dressed and groomed. Plaintiff complained of sleep disturbance and conflicts in her marriage. She described a life-long history of explosive temper and impulsivity. "She came from a dysfunctional family. She was placed in foster placements, eventually abandoned her foster placement at the age of 15 and has been on her own since that time." She stated that she drove her car 80 miles per hour, and nothing happened, she was hoping she would have an accident and "be done with". Dr. Fayne discussed alternatives to self-destructive behavior. Plaintiff agreed to follow through to get her GED and adjusting her scheduling between work and excessive sleeping so she could move forward. Plaintiff was given samples of all her medications including Effexor, Depakote[4], and Seroquel.

On December 6, 2000, plaintiff and her husband saw Fred A. Fayne, M.D. (Tr. at 333). "We worked on developing a financial plan between them that they both would work at. It was a very pleasant session." Plaintiff appeared to be eating and sleeping better, she had been seeing her family doctor due to swollen ankles. "We talked about her diet, which she has not been following." He continued her on the same treatment program.

On December 19, 2000, plaintiff saw Fred A. Fayne, M.D. (Tr. at 332). Plaintiff was appropriately dressed and groomed. Plaintiff's husband attended with her, and they discussed their problems, mainly their communication and how they were handling finances in their home. "We talked about the need to get themselves financially stable and decrease some of the stress in

---

[4]Treats seizure disorders such as epilepsy, complex partial seizures, and absence seizures. This medication also helps to prevent migraine headaches, and to control mania associated with bipolar disorder.

their lives."  Plaintiff was continued on her current medications.

On January 3, 2001, plaintiff saw Thomas McKeel, M.D. (Tr. at 290).  She had gone to the emergency room and was found to be markedly hyperglycemic with a blood sugar of 375. "They prescribed medication for 2-3 days, but she is without medication today completely.  Her blood sugar today is 356.  She feels well, otherwise, and has no particular problems."  Dr. McKeel performed a physical exam and found that plaintiff had full range of motion of upper and lower extremities.  He diagnosed exogenous obesity; and diabetes mellitus, poorly controlled.  He prescribed Glovocane for diabetes, and told plaintiff to return in two weeks.

On January 3, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 332).  She was appropriately dressed and groomed.  She had been out of her medications for at least a week. She had not been sleeping.  "She is having ongoing conflicts with her husband."  Plaintiff was upset and angry at having been diagnosed with diabetes.  "We discussed the implications of self-care, following through with medical treatments, taking her medications appropriately, and following a strict diabetic diet.  In addition, losing 40 to 50 pounds to get her diabetes in an ideal situation for a long-term care.  We discussed her relationship with elevated blood sugars to mood swings.  Patient was very negative throughout most of the interview".  Plaintiff was given samples of Depakote, Seroquel, and Effexor XR.

On January 23, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 331).  She was appropriately dressed and groomed.  She was still having severe conflicts with her husband over financial matters.  "She still is very immature in her overall behavior and presentation. . . .  She does not follow through with recommendations."  Plaintiff was continued on her medications

10

with no side effects.

On January 24, 2001, plaintiff saw Thomas McKeel, M.D., for a follow up on diabetes (Tr. at 289). Her blood sugar was 163. "She is still not quite as compliant as she should be with the diet. I discussed this with her today. We will arrange for her to talk to the dietician and see if we can improve her dietary compliance. Otherwise, she feels fairly well." Dr. McKeel assessed diabetes mellitus and exogenous obesity. He told plaintiff to continue taking Effexor, Trazodone, Seroquel, Clorazepate (Tranxene) as prescribed by the psychiatrist, Glocovance for diabetes, and return in six weeks. "Patient advised to follow up with dietician as we suggested so that we could get dietary compliance. The importance of good dietary control and weight loss was carefully explained to the patient. She presently weighs 263 pounds. She was advised to follow with the dietician either here or at the International Diabetes Center across the street for further evaluation and assessment of dietary management."

On February 1, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 331). Plaintiff was appropriately dressed and groomed. She had been off work for the past five days due to the flu. Plaintiff was depressed and upset because her husband had not followed through with setting up his treatment appointments.

On February 10, 2001, Fred A. Fayne, M.D., wrote a letter to whom it may concern, stating that plaintiff was medically disabled for work from January 25, 2001, through February 10, 2001, due to the flu. He released her to return to work on February 10, 2001 (Tr. at 338).

February 15, 2001, is plaintiff's alleged onset date.

11

On March 3, 2001, plaintiff was seen at St. Luke's Hospital (Tr. at 410-416). She complained of back pain that started three days earlier "while lifting" at work (Tr. at 413). Her blood pressure was 117/68. She had "painless range of motion" in her back (Tr. at 414). Straight leg raising was negative. The doctor assessed acute myofascial lumbar strain (Tr. at 414). Plaintiff was given prescriptions for Vioxx [non-steroidal anti-inflammatory], Vicodin [acetaminophen (Tylenol) and hydrocodone, a narcotic analgesic], and Norflex [muscle relaxer]. She was observed as being aware and alert, and after given medications, her pain was controlled (Tr. at 411). The doctor released her to return to work on March 4, 2001, but lifting up to five pounds, pushing and pulling up to ten pounds with wheels, and told her to follow up with "corporate care as needed."

On March 12, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 331). Plaintiff was appropriately dressed and groomed. "She states that she has been laid off from her job due to poor health. She is now thinking about going back to school and finishing her GED and possibly getting into a vocational program. She still is dealing with some marital conflicts primarily setting around inactivity and husband refusing to be fiscally responsible. We discussed issues of the patient getting back into school and training for her own feelings of self-worth and self-esteem. This is a very positive way to approach that issue. We discussed the patient's lack of drive and motivation".

On April 3, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 330). Plaintiff was appropriately dressed and groomed. She was in good spirits, although she complained about her husband's compulsive buying  behaviors. "She is still very frustrated with him and would still like

to see him more financially stable."  Plaintiff had been out of her medications for two weeks.

"When she was in last she did not let me know this even though I asked her about her

medications."  Dr. Fayne gave plaintiff's samples of Seroquel, Effexor XR, and Depakote.

On May 10, 2001, plaintiff saw Thomas McKeel, M.D., for a follow up on diabetes (Tr. at

288).  Plaintiff reported that she was not on a diabetic diet, and she had not followed up with a

dietician.  Plaintiff's blood sugar was 178.  "She otherwise feels fairly well."  She reported that she

was unable to be employed because she has significant back pain whenever she sits or stands for a

prolonged period.  Dr. McKeel assessed diabetes mellitus, exogenous diabetes, and low back pain.

Dr. McKeel prescribed Glucovance for diabetes, Clorazepate (Tranxene) as prescribed by the

psychiatrist, Seroquel (an antipsychotic medication), Trazodone (an antidepressant), and Effexor

(an antidepressant).  "Return to our office in two months.  We will then assess her dietary

compliance and weight.  I encouraged the patient to lose weight, as this will help her diabetes

tremendously, as she weighs 274 pounds.  She was given an 1800 calorie ADA [American

Diabetes Association] diet today.  I suspect she is eating probably 3000 calories.  I encouraged

her to follow this diet.  I also explained the importance of good dietary control of diabetes to

prevent any organ damage."

On May 14, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 330).  Plaintiff was

appropriately dressed and groomed.  She was very upset and angry with her husband.  Dr. Fayne

discussed plaintiff's childhood.  Her medications were not changed.

On June 5, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 330).  Plaintiff was

appropriately dressed and groomed.  "She is angry with her husband because he will not

cooperate with her in financial management and paying the bills on time. She is also upset with him because there are no social outlets. . . . He describes himself as going to work, eating all he can, drinking beer, sitting in his chair, and going to sleep. She finds this life to be very boring." Dr. Fayne observed that plaintiff was making improvement, her attitude was more stable and more positive, she had less bitterness, she was making efforts to do more things socially using family and other friends to get out independently. Plaintiff's sleeping and eating habits had improved, her thought productions were relevant and coherent, her insight and judgment were much improved, her feelings of self-worth and her self-esteem were improving. Dr. Fayne gave plaintiff some samples of her medications.

On June 19, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 329). Plaintiff was appropriately dressed and groomed. She was very upset with her husband because of his stubborn habits, and she saw him as lazy. "He does not participate in the care of the home, cleaning, cooking, or preparing food." Plaintiff stated that she was planning to go back to school and get her GED and then get into a vocational program that will pay her a good salary, that will allow her the independence that she would like to have. Dr. Fayne noted that plaintiff's moods, feelings of self-worth and self-esteem were improving. He made no changes to her medications.

On July 5, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 329). Plaintiff was appropriately dressed and groomed. Plaintiff was having some recurring memories about her childhood regarding child abuse by an aunt with whom she lived after having been abandoned by her alcoholic mother. She recalled sexual abuse by other relatives and self-harm behaviors that she had practiced for several years as a result of her negative self-image. Dr. Fayne kept

14

plaintiff's medications the same.

On July 19, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 329). Plaintiff was appropriately dressed and groomed. "We spent the session dealing with some of the interpersonal conflicts going on in the marriage". Plaintiff saw herself as doing most of the giving in the relationship and receiving very little. Plaintiff left feeling much better. Dr. Fayne kept her medications the same.

On August 2, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 328). Plaintiff was appropriately dressed and groomed. Her husband brought her to the appointment and they appeared to be making "great progress" in terms of communication. "We are continuing to work on marital conflicts, communication issues, and problems with controlling the finances in the home."

On August 16, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 328). Plaintiff was appropriately dressed and groomed. Affect and mood were stable. Plaintiff's husband came to the appointment, and plaintiff came in angry. She and her husband were fighting over finances. "She is complaining that her husband is always spending. He is complaining of her lack of loyalty and taking responsibilities for more things in the home." Plaintiff complained that her husband did not bring his money home after he worked. "We decided that we will have several meetings together to see if we can get this family stabilized, which would diminish this patient's depression". He continued her on the same medications without changes.

On August 28, 2001, plaintiff saw Thomas McKeel, M.D. (Tr. at 287). Plaintiff's blood sugar was 329, and she said she had not taken her medicines for the past seven to ten days. "I

15

am unclear as to why the patient is not taking her medicines for her diabetes that is Glucovance, but she apparently is not taking the medicines for the past 7-10 days. This will clearly explain the elevated blood sugars." Plaintiff reported that she was depressed. Lungs were clear on exam. Dr. McKeel assessed diabetes mellitus, poorly controlled; depression; exogenous obesity; and low back pain, improved. He prescribed Glucovance (for diabetes), Clorazepate (Tranxene) "as needed per psychiatrist", Seroquel (an antipsychotic medication), Trazodone (an antidepressant), and Effexor (an antidepressant).

On August 30, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 328). Plaintiff was appropriately dressed and groomed. she was still complaining about her husband's behavior. She had been unemployed for several months. "She has been very angry and upset because of her lack of personal income. She feels that he is still not sharing his income openly as he should, that he is still keeping secrets." Dr. Fayne continued plaintiff's treatment program with no changes in her medications.

On November 12, 2001, plaintiff saw Thomas McKeel, M.D., for a follow up on cough and shortness of breath (Tr. at 285). She had been seen at the emergency room three days earlier and was given Aerosol treatments and antibiotics. Plaintiff's blood sugar was 266. Lungs were clear, cough had completely resolved. "She states that she has been unable to follow up with her psychiatrist but she is clearly depressed to a degree and should follow up with him." Dr. McKeel diagnosed acute bronchitis with asthmatic component; diabetes mellitus type 2, poorly controlled; depression, and exogenous obesity. He prescribed Glucovance for diabetes,

16

Clorazepate[5], and gave plaintiff some Effexor, an antidepressant.

On December 17, 2001, plaintiff saw Fred A. Fayne, M.D. (Tr. at 327). Plaintiff was appropriately dressed and groomed. She had not been to see Dr. Fayne for "two or three months." Plaintiff was not working. Her husband was working as a maintenance person at a college. "The patient spends most of her time all day sleeping in bed feeling unmotivated and frustrated with her life." There were a lot of passive-aggressive behaviors between plaintiff and her husband. Dr. Fayne observed that plaintiff had gained an excessive amount of weight due to inactivity. "The plan is for her to start getting busy and focusing on getting things done every day including some of the plans that she wants to do to her home to make it more comfortable." Dr. Fayne discontinued the Effexor XR and prescribed Celexa and Wellbutrin. He continued plaintiff on Seroquel and Depakote ER.

On January 9, 2002, plaintiff filed her first application for disability benefits.

On January 15, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 327). Plaintiff was appropriately dressed and groomed. She was feeling very unsupported in her marriage. "She is now up to 260 pounds. She is sleeping excessively." Dr. Fayne recommended that plaintiff eat a 1,000 calorie per day diet of baked, broiled, or boiled meat and 80% of her diet from fruit, vegetables, and grains. "The relationship between her and her husband is rather platonic. She gets fed up with him and his behaviors." Plaintiff was upset because her husband did not get her a birthday card, give her a gift, or say happy birthday to her. Dr. Fayne recommended that plaintiff stick to her diet and try to lose six to eight pounds per month for the next ten to 12

_____

[5]Treats anxiety and insomnia.

months, that she "work on things such as her weight that would improve her overall feeling of self-worth."

On January 29, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 326). "She is having difficulty functioning at a level at which she feels is adequate to deal with things [at] the present in her life and her marriage. She feels trapped. Her husband is not working with her to make their marriage work although they have been together for 11 years. She is not working due to somatic problems, complaining of back and other things that would interfere with her working. The truth of the matter is she is very angry and frustrated with dealing with her husband and has no intention of working. Her plan is to make him support her. Her insight does not allow her to recognize this. This is not a healthy way to deal with things. The patient is continuing in therapy and gets upset when confronted with these issues."

On February 6, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 325). Dr. Fayne noted that plaintiff was appropriately dressed and groomed. "The time was spent dealing with the interpersonal conflicts between herself and her husband." Plaintiff admitted she had had an extramarital affair after which things changed in terms of intimacy between her husband and herself. Plaintiff complained that she was still not sleeping at night. Dr. Fayne prescribed Depakote, Trazodone, and Tranxene.

On February 12, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 326). Dr. Fayne observed that plaintiff was appropriately dressed and groomed. "This unemployed lady has been followed for the past year in the clinic for treatment of major depression and anxiety disorder with the fear of failure syndrome. She is currently nursing a back injury for the last four months."

18

Dr. Fayne observed that plaintiff had not worked, and she was using her back as a tool to deal with her husband with whom she had a lot of anger and frustration. "[S]o she has decided that she is going to 'Make him support her'. She is sleeping 12 to 15 hours per day. When she is up, she watches television. She does very little productive." Plaintiff admitted she had not seen a back specialist and had no treatment program for her back. Dr. Fayne observed that plaintiff believed if her back improved, she would have to "get out and do something. This is her passive aggressive way of dealing with her feelings with her husband whom she feels ignores her feelings and is 'a slob'." Plaintiff stated she was feeling useless, hopeless, and helpless. Dr. Fayne observed that plaintiff was "very covertly angry" and that she had gained excessive weight due to her inactivity despite her expressing the desire to lose weight. "She is not willing to do what it takes to lose the weight. She sees her husband as indifferent. She does not recognize his frustrations with her as being legitimate. We discussed this patient getting back involved. She has used the fact that she only completed the 7th grade . . . . It was suggested that she attend some adult education classes and get involved in the GED program simultaneously and in a year she could have herself very well functioning to be prepared to move on educationally with her life." Dr. Fayne reviewed plaintiff's medications, she denied any significant side effects, no changes were made.

On March 12, 2002, plaintiff saw Fred A. Fayne, M.D., for a follow upon major depression recurrent severe, and marital mal adjustment (Tr. at 325). Plaintiff's husband was also in treatment and was making good progress. "She feels that the marital strife and ordinary stressors are improving by both being seen for therapy. No suicidal thoughts or psychosis."

19

On March 14, 2002, plaintiff saw Joyce Majure-Lees, M.D. (Tr. at 292-297). Portions of Dr. Majure-Lees's report read as follows:

CHIEF COMPLAINT: Back pain.

HISTORY OF PRESENT ILLNESS: The patient stated that she fell on some steps when she was working at the Fairmont Hotel in September 2000. She saw a company doctor at St. Luke's Hospital. X-rays were negative. She had no MRI or CT scan. She did have physical therapy at Baptist Hospital for two weeks. She was then referred to Dr. Patton at Research Hospital. She states that his report indicated that she was uncooperative. She complains of pain in the lumbar area, especially with bending over for five minutes. Her feet get numb with standing, both on the top and bottom of them, and she has frequent "charlie horse muscle spasms in her legs." . . . She states that if her feet are hanging down with sitting, they go numb as well. She did return to work, but continued to have back pain and stated that she was let go because she called in for too many sick days because of that. She walks for four minutes and then sits down. Sitting for 15 minutes causes the numbness in her feet and she gets up and walks. She also has right calf pain from being on her feet too long like for 10-15 minutes.

\* \* \* \* \*

REVIEW OF [SYMPTOMS]: The patient states that she has had depression with low self esteem and a negative attitude. . . . She does see a psychiatrist, Dr. Fayne. She also indicated that she had had asthma since 1994 and it is controlled with inhalers and medication. . . . She has headaches on the left side of [her] head and has had for three years. She usually lies down to try to get rid of the headache. . . . She has had diabetes mellitus diagnosed in December 2000. Her blood sugars are running 334 for the last week. She indicates that she only eats one meal per day. . . .

FAMILY HISTORY: Father is deceased at age 56 of heart disease. Mother is deceased at age 64. She had asthma, diabetes, and heart disease, and also had a stroke. She has three sisters and ten brothers. She states that they are all "crazy".

SOCIAL HISTORY: . . . She finished the sixth grade and did not get her GED. She has been married once and is presently living with her husband. They have no children. She denies alcohol use. She does smoke one pack per day and has for fifteen years.

PHYSICAL EXAMINATION: Ht 5' 8 ¼". Wt. 278 lb. . . .
GENERAL: . . . She initially moved somewhat slowly when entering the office and exam room, but at the time of dismissal, was walking much more briskly. She could get on and off the table without difficulty. She did sigh a few times indicating some discomfort. Her

20

gait was normal without assistive device. . . .

CHEST: . . . She did have slightly diminished breath sounds bilaterally in the bases. . . .

EXTREMITIES: Examination of the upper extremities showed that she had mild limitation so ROM [range of motion] of forward flexion[6] of the right shoulder at 178° [normal is 180°] and abduction[7] at 175° [normal is 180°] and complained of lower back pain with doing that maneuver. ROM of her elbows and wrists were normal. . . . She had a good hand grip at 5/5 bilaterally and upper extremity strength was 5/5 as well. . . . Examination of the lower extremities showed that she had normal extension of her knees. . . . She had mild decrease in forward flexion[8] of her hips on the right at 95° and the left at 90° [normal is 100°]. Backward extension was also decreased on the left at 25° [normal is 30°]. The rest of the ROM was normal. ROM of her ankles was normal. . . .

SPINE: Examination of the cervical spine showed that she had a very minimum decrease of extension[9] to 70° [normal is 75°]. The rest of the range of motion was normal. Examination of the lumbar spine showed no tenderness. She did have decreased ROM. Forward flexion [bending forward] was limited to 55° [normal is 90°] and backward extension [bending backward at the waste] to -18°. Right and left lateral flexion [bending side to side at the waste] was 18°/10° [normal is 25°]. Sitting straight leg raising was negative to 90 bilaterally. Supine straight leg raising was to 58° on the right and 60° on the left with back pain. She had good strength in the lower extremities at 5/5. . . . She was able to squat 1/4 of the way down and complained of ankle pain with that. Heel and toe walking were fair, but much more difficult on the left side. Station was normal.

MENTAL: Her mood appeared to be mildly depressed and her affect was minimally flat as well.

DIAGNOSIS:
1)      Chronic low back pain without radiculopathy [an irritated nerve root causing pain which radiates from the spine to the extremities], but with decreased ROM.
2)      Depression.
3)      Diabetes mellitus poorly controlled.
4)      Headaches.
5)      Asthma and chronic bronchitis, well controlled.
6)      Mild left foot discomfort. No  known injury.

---

[6]Starting with arm straight at the side, lifting it up in front of the body and above the head.

[7]Starting with arm straight at the side, lifting it up to the side of the body and above the head.

[8]While lying down, lifting the knee (while the leg is bent) toward the body.

[9]Leaning the head back, as if looking to the sky.

21

WORK RELATED ACTIVITIES:  The patient can carry frequently 10-15 lb. as was exhibited by the heaviness of the purse that she brought with her today.  Probably she can lift occasionally 20 lb.  She has limitations of walking for brief periods of five minutes at a time, but then needing to sit and rest.  She needs to alternate her position after 15-20 minutes of sitting.  She does not drive. Standing is also limited to 10-15 minute intervals as well.  She has no limitations of use of her hands and handling objects.  There is no limitation of hearing and speaking.

On April 9, 2002, Douglas Vaughan, Ph.D., completed a Psychiatric Review Technique (Tr. at 299-312).  Dr. Vaughan found that plaintiff suffers from affective disorders and anxiety-related disorders due to major depression and anxiety.  Dr. Vaughan found that plaintiff suffers from mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.

Dr. Vaughan also completed a Mental Residual Functional Capacity Assessment (Tr. at 313-315).  Dr. Vaughan found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

22

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was moderately limited in the following:

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

He found that there was no evidence of limitation in the following:

- The ability to understand and remember detailed instructions

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. Vaughan did not make any finding with regard to plaintiff's ability to carry out detailed instructions.

In support of his findings, Dr. Vaughan wrote the following:

This 38 year old female did not allege any psych complaints on 3368 or ADL's [activities of daily living] form but alleged back and leg problems. Last work was 2/00 - 3/01 at Fairmont Hotel as an office coordinator.

23

She reports that she eats out a lot, shops for clothes, and irons her husband's uniforms.

Ct. has seen Dr. Fayne, psychiatrist, since 8/1/00 when Major Depression without psychosis was diagnosed along with Generalized Anxiety Disorder with PTSD [post traumatic stress disorder] were diagnosed. The preponderance of the clinical evidence describes marital problems and the ct.'s anger with husband for not participating more in the home responsibilities, etc. Dr. Fayne made the following salient statements on 1/29/02: "She is not working due to somatic problems, complaining of back and other things that would interfere with her working. The truth of the matter is she is very angry and frustrated with dealing with her husband and has no intention of working. Her plan is to make him support her." (Emphasis added). This sentiment was reiterated on 2/12/02. Yet, on 2/12/02 it was noted that she had not seen a back specialist nor had any treatment for her back.

Physical CE [consultative exam] on 3/14/00 related that mood seemed mildly depressed with minimally flat affect. She denied S/I [suicidal ideation] and HI [homicidal ideation].

With a history of depression and anxiety, marital issues and related apparent somatic dynamics appear to be the predominant factors.

Ct. appears to be capable of performing simple and some detailed tasks, but volition would seem to be a salient factor. She would likely [be] to[o] angry and resentful with others about having to work.

On April 11, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 325). "This is a patient who is currently on disability with severe back problems. She was fired from her last job due to poor participation. She and her husband have had ongoing marital conflicts because of finances and her lack of motivation and effort to better herself. We discussed her going back to get her GED, and getting involved in a Vocational Program which will allow her to find a job that she could do that will fit with her physical limitations. We discussed her over involvement with her dysfunctional family, a number of them are into drugs and abusive related activities, some of them apparently have criminal records. She has felt used and abused by them, she has decided that she is going to cut herself off from them and distance herself. . . . [T]here is a lot of anger

24

and frustrations that have been unresolved, because of her poor communication skills and avoidance of issues. She left feeling better, was resolved that she is going to start the GED program at Donnelley College and move from there to a Vocational Program. She has also planned some joint sessions with her husband to work on marital issues."

On April 30, 2002, Fred A. Fayne, M.D., completed a form, marking plaintiff "permanently disabled", so that she could get disabled license plates for her car (Tr. at 342).

On May 1, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 324). "This is a disabled lady who is being treated for major depression recurrent severe. The patient came in today very angry, frustrated, complaining of severe marital conflicts, financial stress, and inability to get cooperation from her husband in following through with plans we have set up to eliminate some of the stress in the relationship." Plaintiff was complaining about back pain, leg pain, and swollen feet. "She was recommended very urgently to get into see her family physician. I gave her a prescription for Furosemide [a diuretic which reduces swelling] and Potassium Chloride[10] to cover her until she gets in to see her physical medical physician." Dr. Fayne gave plaintiff samples of Zoloft [treats depression and anxiety] and Celexa [treats depression]. Plaintiff denied any suicidal ideation or psychosis, she was very frustrated with her life. "We made plans to set up a joint session between the patient and the husband where they are supposed to bring with them a written statement about their financial plan."

On May 3, 2002, plaintiff filed another application for disability benefits.

---

[10]Potassium chloride is used to treat or prevent a lack of natural potassium in the body.

25

On May 13, 2002, plaintiff returned to see Fred A. Fayne, M.D. (Tr. at 324).

She came in today very anxious, somewhat agitated, angry with her husband, complaining of the fact of his not paying bills and keeping things organized and trying to follow some financial plan as we had set up. She feels he does not respect her, treats her with disrespect because she doesn't have a high school diploma. The plan is to complete her GED program and go to college and complete her education in computers. She was encouraged to follow through with same. She verbalizes a lot of frustration with the way things have gone in the marriage. . . . She did bring in a financial plan which we plan to confront the husband with as part of his session."

On May 22, 2002, plaintiff saw Martha Lapietra, M.D., to establish care (Tr. at 344-347). She complained of back pain, worse with standing for a long time or sitting for a long time. She said massage helps. She was not following a diabetic diet. She complained of asthma/wheezing, heartburn, sleeping difficulty (sleeps from 7:00 a.m. to 11:00 a.m. only), and depression. She was smoking one pack of cigarettes per day. Her weight was 272 pounds, blood pressure was 140/90. On exam, her chest and lungs were clear, she had regular heart sounds. Her back was diffusely tender, knees were normal, gait was normal. Dr. Lapietra diagnosed uncontrolled diabetes, chronic back pain, gastroesophogeal reflux disease, and depression. She prescribed Flexeril, and told plaintiff to lose weight and follow a diabetic diet. Plaintiff also had lab work done which showed her total cholesterol high at 293 (normal is < 200), triglycerides were high at 260 (normal is < 150), and her LDL cholesterol was high at 197 (normal is < 130).

On May 30, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 399). Plaintiff was appropriately dressed and groomed. Her mood was stable and bright, she was smiling, friendly.

Her thoughts were logical and coherent.

On June 13, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 399). "The patient is very concerned that their social outlets are limited, she is concerned that her husband will not dress appropriately to take her out to different places." Insight, judgment, and behavior were improving.

On July 2, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 399). Plaintiff was appropriately dressed and groomed and her mood was stable. Plaintiff continued to deal with marital problems, was trying to get things more organized in her home, was "getting more productive." She had completed four of the programs toward her GED. Plaintiff was experimenting with her home computer, in the hopes of one day soon going to college to study computers. "Overall, the patient is making more accelerated rate of progress in the past two months." Plaintiff was given samples of Zoloft.

On July 16, 2002, plaintiff saw Elliott Franks, M.D., for an evaluation of her diabetes (Tr. at 377). Dr. Lapietra had given plaintiff samples of Actos but plaintiff had been out of that medication for about a week. "She has not really been watching her diet." She complained of back pain, had used pain medications and muscle relaxers which did not help. Plaintiff weighed 280 pounds, her blood pressure was 120/85. Her lungs were clear, she had no paraspinous muscle spasm. Dr. Franks gave plaintiff samples of Bextra for her back. Plaintiff had blood work done this day as well (Tr. at 382). Her cholesterol was high at 224 (normal is < 200), and her triglycerides were high at 273 (normal is < 150).

27

On July 18, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 399). "She is actually improving. Showing interest now in getting rehabbed." Her plan was to get her GED, go to college, and then get back to work. "Prognosis is felt to be good, with continued psychotherapy and medications."

On August 1, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 396). Plaintiff was angry about her husband's finances. Dr. Fayne held a family meeting . "We had an agreement that they would communicate about all matters of finances and that the husband would give all receipts to the patient so she could keep adequate books. This makes her very angry. She is talking about divorce and moving out or his moving out. She sees her husband as not cleaning up after himself, as she does. . . . After considerable ventilation of her anger and frustration with the home situation, the patient was able to calm down and start to relax and make some plans for the next sessions."

On August 15, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 396). "She currently is in a disability state due to a back injury so she is not working. The husband is the sole source of income which leads to major conflicts in the family." Plaintiff had developed a record plan in the computer for their bills. She was working on her GED through a computer program.

On August 21, 2002, Margaret Sullivan, Ph.D., a psychologist, completed a Mental Residual Functional Capacity Assessment (Tr. at 355-358). Dr. Sullivan found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions

28

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. Sullivan found that plaintiff was moderately limited in her ability to understand and remember detailed instructions.

Dr. Sullivan relied on the progress notes of Dr. Fayne in addition to other medical records. She found that plaintiff could succeed at tasks of low skill in a less stressful environment.

That same day, Dr. Sullivan completed a Psychiatric Review Technique (Tr. at 359-370). She found that plaintiff suffers from disturbance of mood as evidenced by sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. These findings were based on the initial medical report of Dr. Fayne in August 2000. Dr. Sullivan also found that plaintiff suffers from general anxiety disorder, also relying on Dr. Fayne's August 2000 report. Dr. Sullivan found that plaintiff suffers from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.

On August 23, 2002, plaintiff's application for disability benefits was denied.

On September 12, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 396). "She has been making continuous growth and improving in mental status and level of maturity." Plaintiff was angry at her husband for spending money without consulting her. Plaintiff was studying for her GED and planned to go to college to get a degree in computer programming. Her thought processes were relevant and coherent, insight and judgment had improved, her GAF was 60 (moderate symptoms).

On October 8, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 397). Dr. Fayne noted that plaintiff's marital problems were contributing to her depression. "She is responding to the psychotherapy and medications progressively well, being more assertive, more decisive, making choices that are healthy. She is doing well in her GED program with plans to complete the program in the next 2-3 months then start a program in computers at the Junior College". Her personal hygiene, grooming, activities of daily living had improved. "[P]rogress is felt to be good with continued treatment."

On October 14, 2002, plaintiff saw Katarina Latkovich, M.D. (Tr. at 374-375). Plaintiff requested medication for her back pain and for anxiety. Plaintiff told Dr. Latkovich that her psychiatrist had given her hydrocodone for her back, but then she was later given over-the-counter medications which did not work well. "When I went further and asked her questions about her back pain, it appears that she had a back injury back in 2000. At that time, she slipped at work and fell. She did have nothing except for x-ray of her back and claims that she never saw any specialist. Later on actually, it appears that she did see Dr. Pratt, but was not happy with his treatment and what he was offering and did not go back. She never had any injections". Plaintiff reported that she ran out of diabetes medicine two weeks earlier but did not bother to call for refill. She had also been out of her inhalers for a while. Plaintiff was smoking more than a pack of cigarettes per day. Her blood pressure was 128/80, weight was 282 pounds. Lungs were clear, she had trace edema in her legs, she had severe tenderness over her paraspinal muscles in the midthoracic and lower back with decreased reflexes and mildly decreased strength. "I had a lengthy discussion with Caroline today. I did explain that I am not prescribing the hydrocodone

31

for the back pain." Dr. Latkovich told plaintiff she needs to see a pain specialist. Plaintiff's

diabetes was noted as "very poorly controlled". Dr. Latkovich gave plaintiff a prescription for

Glucovance and encouraged her to take it and to check her blood sugars. "I had a lengthy

discussion with Caroline. She does not appear to be interested in stopping smoking." Dr.

Latkovich told plaintiff she needed to get anxiety medication from her psychiatrist.

On October 21, 2002, plaintiff saw Katarina Latkovich, M.D., for a physical  (Tr. at 372).

She also requested an evaluation of her low back, "apparently never made an appointment for

the pain specialist. . . . Unfortunately, she is still a smoker." Plaintiff's blood pressure was

118/80. She was observed as being awake, alert, oriented, and pleasant. She had trace edema in

her extremities, normal strength in her arms and legs. Dr. Latkovich assessed severe low back

pain and made an appointment for plaintiff with a pain specialist. "I did refuse again to give her

hydrocodone". She found that plaintiff's asthma was well controlled. Plaintiff had blood work

done this day as well (Tr. at 379). Her triglycerides were high at 243 (normal is < 150), overall

cholesterol was high at 302 (normal is < 200), HDL cholesterol was low at 38 (normal is ≥ 40),

and LDL cholesterol was high at 215 (normal is < 130).

On October 29, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 398).  Plaintiff was

appropriately dressed and groomed.  Plaintiff came in very distraught, stating she is not

motivated to continue working on her GED program.  She was angry with her husband about

finances.  She was sleeping excessively during the day to avoid contact with her husband.

Plaintiff was given samples of Zoloft.

32

On November 12, 2002, plaintiff saw Fred A. Fayne, M.D. (Tr. at 398). "Because of her current situation [with her husband] she feels relegated to the position of dependent without choice." He encouraged plaintiff to continue with her GED program. Her current GAF was 50[11], prognosis guarded. "We have made arrangements for her to financially continue therapy." He gave her samples of Seroquel and Zoloft.

On December 12, 2002, plaintiff saw Fred A. Fayne. M.D. (Tr. at 398). Plaintiff was showing some improvement in spirits and mood. Some of the marital stress was dissipating, she was successfully working on her GED. She felt her husband was being supportive instead of being critical, and she appeared to be functioning much better.

On January 27, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 386). She continued to complain about the stress created by her husband's handling of the finances. She was working toward her GED but having trouble with math. Dr. Fayne suggested she consider one of the local programs to get some help with her math. Meanwhile, plaintiff was continuing to work on her computer and was becoming computer knowledgeable and felt good about herself. "She is dealing with a lot of her husband's negativism around financial issues much better, she is able to laugh about some of the things she feels are destructive. Denies any suicidal ideation or psychosis. Thought productions are relevant and coherent. Her coping skills are much improved. Patient is making slow but progressive improvement."

---

[11]A Global Assessment of Functioning of 41-50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

33

On February 19, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 386). Plaintiff was very angry and frustrated in dealing with marital issues. There were ongoing conflicts over financial management and plaintiff felt her husband was not carrying his share of the home responsibilities. Dr. Fayne noted that plaintiff's thought process were relevant and coherent, she denied any suicidal ideation or psychosis.

On April 24, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 386). She continued to have a lot of difficulty in her marriage. "She is still working on her GED through her computer program, the goal is still to get herself financially independent so that she has some choices about her life in the future. Denies any self harm thoughts. Thought productions are relevant and coherent. She is medication and treatment compliant."

On May 8, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 385). Plaintiff was appropriately dressed and groomed. She complained of her husband's management of their finances, said he avoids her by either being silent or leaving home to avoid dealing with her. "Communication is very poor, there is a lot of getting even between the two of them". Plaintiff continued to work toward her GED "which apparently she is doing fairly well with." Dr. Fayne described plaintiff as an overall unhappy person.

On June 11, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 385). Plaintiff continued to have a lot of anger and frustration with her husband for not being as supportive as he should be and for not managing the finances better. "Her husband has basically declared his independence in regards to his being the breadwinner and being able to manage his finances after he gives her an allowance." Plaintiff was encouraged to work on her GED, be treatment compliant, and finish

34

her education so she could make choices about what she wants to do with her life.

On July 2, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 384). Plaintiff was working on her GED, but was having trouble in math. "Her ultimate plan is to go to college and major in computer science. She plans to become gainfully employed and independent." Plaintiff was planning to take a vacation to Mississippi to visit family after the holidays. Thought process were relevant and coherent, plaintiff denied any self harm thoughts or psychosis.

On July 29, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 384). Plaintiff was still working on her GED, was having trouble with math, but had been doing very well up to this point. "Patient currently is very inactive. She is concerned about losing weight. States she is not motivated at this point."

On August 13, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 384). He noted that she had ongoing marital conflicts dealing with her husband, but that a lot of their issues were avoidable and would not take a lot of effort on her husband's part, such as "cleaning up after yourself, putting things back where they belong, storing his tools in the proper place". Plaintiff's thought processes were relevant and coherent, she denied any self harm thoughts or psychosis. Dr. Fayne discontinued plaintiff's previous medications and prescribed Klonopin for anxiety, Lexapro for depression, and Zantac for GERD.

On August 21, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 383, 395). He noted that plaintiff and her husband had ongoing conflicts over finances. "She is currently working on her GED through a computer program. Her intention is to get through this program and go to Junior College and major in computer science with the intent to get a job and become

35

independent of her husband. Patient has not worked for the last couple of years, currently the only income is her husband's income." He noted that plaintiff's thought process were relevant and coherent, she denied any self harm thoughts or psychosis.

On September 5, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 383, 395). "Patient is becoming more confident in herself and able to express herself more clearly. She admits that she is now taking her medication on a regular basis, which she states she had not been doing in the past. States she feels much better spiritually. Says her tolerance for stress is better."

On October 10, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 395, 427). "She has been making good progress, still having ongoing marital conflicts, primarily centering around financial issues. . . . The patient's emotional growth has been very good, she has gone from a very immature, impulsive person, feeling very low about herself to improving her feelings of self worth and self esteem and is now being more assertive, making plans for the future. She is working on completing her GED. Thought productions are relevant and coherent, denies any self harm thoughts or psychosis. She is a very bright woman who was under educated due to dropping out of school early in life."

On October 16, 2003, plaintiff saw Teresa Marshall, M.D., for worsening back pain in the upper and mid back areas (Tr. at 387). Plaintiff also requested refills of her diabetes medication and her asthma medication. Dr. Marshall performed an exam and found plaintiff's range of motion in her back to be normal. She had moderate thoracic paraspinous muscle spasm and trapezius muscle spasm and well as tenderness to palpation. She prescribed Skelaxin (a muscle relaxer), told plaintiff to continue taking Ibuprofen, do back exercises, and follow up in three

36

months.

On October 24, 2003, plaintiff saw Craig Lofgreen, M.D., with complaints of back and knee pain as a result of her fall at work several years earlier (Tr. at 391-392). "The patient is somewhat evasive about any awareness of any objective abnormality, pleading ignorance in that regard."

> Physical exam reveals an extremely obese individual who . . . in the course of asking to perform deep breathing during pulmonary auscultation developed coughing and a rather dramatic degree of distress, leaning against the walls and spitting up for several minutes after that. Her HEENT [head, eyes, ears, nose, throat] exam appeared unremarkable. The chest auscultation did not reveal obvious wheezes. The abdomen is massive. Extremities indicate the patient's lack of cooperation with range of motion testing of the right knee, though obvious pathology was not apparent. Her straight leg raising test is negative. Upper extremity evaluation is unremarkable.

> The patient has impairments, including central nervous system, possible asthma, adult-onset diabetes, and severe obesity. It appears that her competitiveness in the job market is virtually nil, though she appears to have skills as an "assistant office manager" at a previous employer. An examination of her previous work history may be informative.

On October 27, 2003, Craig Lofgreen, M.D., entered a comment in plaintiff's medical records stating that the right knee and lumbar films "seem normal" (Tr. at 393).

On December 8, 2003, plaintiff saw Fred A. Fayne, M.D. (Tr. at 427). Plaintiff complained about her husband, he does things without consulting her, he talks about saving money but spends extravagantly, he does not buy personal gifts for her to make her feel important. Dr. Fayne discussed anger issues with plaintiff, gave her samples of Lexapro.

On January 8, 2004, plaintiff saw Fred A. Fayne, M.D. (Tr. at 427). Plaintiff reported that things were better with her husband. "[S]he actually is in much better spirits and feeling much better about herself. She is continuing to work on her GED program through computer

with a plan to get into a computer technology program. She is in the process of exploring her options for future training." Activities of daily living were adequate, personal hygiene and grooming were adequate, communication was improving, feelings of self worth and self esteem were improving. "She states that sometimes her husband gives her mixed messages about her education versus going to work and getting a job at UMKC where he is employed."

On February 11, 2004, plaintiff saw Teresa Marshall, M.D., for an unrelated issue (Tr. at 402). Dr. Marshall recommended that plaintiff stick to a low cholesterol, low fat diet; that she do regular aerobic exercises; and that she stop smoking.

On March 11, 2004, plaintiff saw Fred A. Fayne, M.D. (Tr. at 426). "This is a disabled housewife who has returned to school through a home program through the computer and has gotten her GED with honors." She was encouraged by Dr. Fayne and her husband to start a college program in computers by the summer. "Patient is feeling good about herself, her self esteem is high, thought productions are relevant and coherent, denies any self harm thoughts or psychosis. . . . She left feeling good. Continue current cognitive behavioral therapy for stabilization, maintenance, and support."

On April 7, 2004, plaintiff saw Fred A. Fayne, M.D. (Tr. at 426). Dr. Fayne observed that plaintiff's thought processes were relevant, activities of daily living were adequate "as is personal hygiene and grooming." He stated that medication was helping plaintiff keep her mental issues under control -- cognitive function, memory, concentration, focus, forgetfulness, irritability, mood swings, and anger management.

On April 7, 2004, Fred A. Fayne, M.D.[12], completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" (Tr. at 403-405). He found that she had "no ability" to relate to co-workers, deal with the public; interact with supervisors; deal with work stresses; function independently; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; or relate predictably in social situations. He found that she had a "poor ability" to follow work rules; use judgment; maintain attention and concentration; understand, remember and carry out detailed, but not complex job instructions; understand, remember and carry out simple job instructions; maintain personal appearance; and demonstrate reliability. None of the doctor's handwritten explanations are legible. Interestingly, the ONLY ability he listed plaintiff as having is the ability to manage her own finances.

On April 14, 2004, the first administrative hearing was held. On April 30, 2004, ALJ Jan Donsbach entered an order finding plaintiff not disabled.

On May 19, 2004, plaintiff saw Cynthia Glass, M.D. (Tr. at 441). Plaintiff stated that she tripped at work in December of 2000 and since that time has had back pain. Plaintiff has only taken ibuprofen for this. "She is reclining on the exam table with legs down. She is obviously in pain and it is difficult for her to sit up. There is diffuse tenderness over the back." Dr. Glass assessed "Low back pain severe by history, unknown evaluation but sounds like she only had plain films." Dr. Glass ordered an MRI of the lumbosacral spine.

_____

[12]Actually, the signature on this form is illegible, and the table of contents of the administrative record acknowledges that the doctor is unknown due to the illegible signature. The title of the doctor is psychiatrist, and ALJ Jan Donsbach referred to this report as having been written by "plaintiff's psychiatrist" (Tr. at 53), who would be Dr. Fayne.

39

On June 4, 2004, plaintiff had an MRI of her lumbar spine performed by John Waddell, M.D. (Tr. at 439). His impression was: "1. Asymmetric disc desiccation and mild intervertebral disc space narrowing at L4-5. There is also a central annular tear without formal disc protrusion. 2. Otherwise, unremarkable MRI of the lumbar spine".

On June 14, 2004, plaintiff saw Cynthia Glass, M.D., for back pain (Tr. at 438). Plaintiff's MRI "did not show surgical disease." Plaintiff complained of decreased hearing, trouble with balance "since she has fallen at work". Dr. Glass observed that plaintiff tended to hold onto things when walking to support herself. Dr. Glass assessed problems with balance and falling, continued back pain, and migraine headaches. She recommended physical therapy and an MRI of plaintiff's head.

On June 25, 2004, plaintiff saw Fred A. Fayne, M.D. (Tr. at 426). Plaintiff was planning to begin a computer course, which she was encouraged to do by Dr. Fayne and plaintiff's husband. Her thought process were relevant and coherent, she denied any self harm thoughts or psychosis.

On July 12, 2004, plaintiff filed her second application for disability benefits, which was consolidated with the first by the Appeals Council.

On August 2, 2004, plaintiff saw Cynthia Glass, M.D., for a follow up on back pain (Tr. at 433, 466). "Her MRI scan did not show any disk herniation, some arthritic changes." Plaintiff complained of memory loss. Dr. Glass found no palpable spasm in plaintiff's back. She assessed chronic back pain, memory loss and headaches, and she ordered an MRI of plaintiff's brain.

On August 3, 2004, plaintiff had an MRI of her brain performed by Thomas Summers, M.D. (Tr. at 432, 463). His conclusion was "There was no intracranial lesion seen. The findings in the left maxillary and sphenoid sinuses are most likely retention cyst or polyps."

On September 28, 2004, plaintiff saw Cynthia Glass, M.D. (Tr. at 465-466). She complained of pain in her hands. The right hand has hurt for two years and she wears brace frequently." Her asthma is bothering her more. She had a coughing spell while in the office. Dr. Glass assessed tendinitis and asthma. She prescribed Celebrex and Azmacort for asthma.

On October 1, 2004, plaintiff was examined by Michael Schwartz, Ph.D. (Tr. at 447-449). Portions of Dr. Schwartz's report read as follows:

I.       Introduction
         . . . She drove herself in to Brush Creek Community Center. . . . Her education is the sixth grade plus she is working on her GED. When asked how she is doing, she states, "It's frustrating. I just can't concentrate and study that long. . . .

II.      Chief Complaint
         . . . She states she has problems being around other people. "I think people are out to get me." She states, on a one-to-one basis, she can do fine but she can not be around groups of people.

III.     History of Present Illness
         Picture of her day: She states that if she does go to sleep at all she will get up around noon, fix food, sit on the couch, take her medication, go back to bed, get up around 4:30 or 5:00, and she watches TV. If she feels tired, she goes to sleep around 1:30. If not, then she is up all night.
         In regards to ADLs [activities of daily living], she states she can vacuum but it is painful. She can not stand long enough to cook. She can not bend over to get into the cabinets. Her husband does the dishes and the laundry. . She can not do stairs. Her husband does the grocery shopping. . . .
         . . . She feels like [her current] medications do help her.
         She states that her childhood was bad because her biological father died when she was one year old and her mother was alcoholic. She was in the state system and at various foster homes from age 7 to 15 years old until she ran away and joined the carnival. This was with an uncle who sexually abused her. This was every day. She

41

states she has nightmares and flashbacks about it daily. . . . When asked whether she has any plans or goals in life, she states, "No."

In regards to her current functioning, she states, "I'd be better off dead. Nothing in life is right. This is not life." . . .

She states she last worked in 2001 as office coordinator organizing the housekeeping at the Fairmont Hotel. She worked there for three years. She was fired because she had to leave early one day. . . .

IV.  Mental Status

Appearance, attitude, and behavior: . . . She used a cane and had a brace on her right wrist. She rocked back and forth. She used a palm pilot type device to pull up what her medications are.

Thought process and content. Her form and flow of thought was logical and to the point. Her thought content was depressive, angry, and bitter. . . . She states she has problems sleeping because of her back pain and she does not close her eyes because she will have a dream and wake up. . . . She ends up sleeping about 3 hours in 24. When asked about the dreams, she states that she has nightmares about one of her foster mothers who used to whip her and made her drop her pants to whip her with rosebush stems. . . . Her concentration is fair. Her memory is fair. . . . When asked about hearing voices, she states she does hear people talking, stating, "Someone's out to get you. Leave people alone." . . .

V.  Summary and Conclusion

. . . I believe her discomfort of being around people can best be seen as part of her PTSD [post traumatic stress disorder] symptomatology.

VI.  Potential of Competitive Employment.

I believe that she can remember work location and procedures and understand and follow simple directions. I believe she has adequate attention, concentration, and short-term memory. She does appear to have serious difficulties with PTSD symptoms, including hypervigilence and wariness around other which would interfere with her functioning on the job. Also, she has a sleep disorder due to her depression and PTSD and her physical problems which would make it difficult for her to be reliable on the job.

VII.  Diagnostic Impression

| | |
|---|---|
| Axis I: | Posttraumatic stress disorder, chronic, severe |
| | Major depression, recurrent, severe, with psychotic features |
| Axis II: | No diagnosis |
| Axis III: | Musculoskeletal difficulties |

Case 4:05-cv-01197-REL   Document 19   Filed 01/22/07   Page 42 of 71

<table>
<tr><td>Axis IV:</td><td>Psycho-social stressors:  physical limitations and pain, history of being physically and sexually abused</td></tr>
<tr><td>Axis V:</td><td>GAF = 45 current [serious symptoms]<br>GAF = 45 highest level in past year.</td></tr>
</table>

On October 12, 2004, plaintiff was examined by Joyce E. Majure-Lees, M.D., at the request of Disability Determinations (Tr. at 453-459).  Portions of Dr. Majure-Lees's report read as follows:

CHIEF COMPLAINTS:  Pain of the entire back, pain in her hands and right knee.  Allegations:  Back injury 9/00, depression, asthma, diabetes, anemia, bronchitis, foot problems, and voice problems.

HISTORY OF PRESENT ILLNESS:  . . .  She did have a MRI of her spine this year.  She believes she has a dislocated disc.  She has had intermittent pain in both hands for a couple of years. . . .  She is wearing a black Velcro wrist brace today and states that she has been doing this for the last month.  She had a blood test for arthritis but does not know the results. . . .  She states that she has been using a cane since 2001. . . .  She says that she has depression with mood swings.  She wants to hurt people. . . .  She has had suicidal thoughts but she would not do it because she does not think she would go to heaven if she did that. . . .

MEDICAL RECORD REVIEW:  She was seen by Cynthia Glass, M.D. . . .  An MRI was done of her lumbar spine, which Dr. Glass stated on 8/2/04, did not show any disc herniation, but she did have some arthritic changes. . . .

MEDICATIONS:  Hydrocodone[13], 5/500 mg 1 q.i.d. [four times a day].  This prescription was dated 5/24/04 stating no refills; Celebrex 200 mg q.d. [once a day], Triamcinolone inhalation 2 puffs b.i.d. [twice a day], Topamax 1 q.d. [daily], Glucovance 5/500 mg b.i.d. [twice a day], Trazodone questionable dosage hs [at bedtime], Ranitidine 150 mg q.d. [daily], Clorazepam 0.5 mg 2 in the daytime and 2 in the evening.

REVIEW OF SYMPTOMS:  . . .  She states that she only eats one meal/day for 3 years. . . .  Activities:  She states that she pays people to do her house cleaning and laundry.  She is able to run the vacuum cleaner for 10-20 minutes.  She cooks about once/month.  Her

---

[13]It is unclear where this prescription came from.  Plaintiff had no doctor appointment on May 24, 2004, and her most recent appointment before that date was with Dr. Glass who did not write a prescription for Hydrocodone.

43

husband cooks usually. She sits for 10 minutes and rocks back and forth. She walks one block and has to rest.

SOCIAL HISTORY: She was born in Pickens, MS, finished the 5th grade, and did not get her G.E.D. . . . She has smoked 1 pk/day of cigarettes for 20 years. . . .

PHYSICAL EXAM:
General: The patient is a well-developed, obese female who carries a cane but does not really bare weight on it. There is no consistent limp but has occasional limping. . . .
Chest: Examination of her lungs showed them to be clear. She did have coughing and used her Azmacort inhaler during the exam. . . .
Extremities: She had full range of motion of her shoulders and elbows. She had full range of motion of her wrists except for palmer flexion of her right wrist at 50 degrees [normal is 60]. . . . She was able to extend her fingers, oppose them, and make a fist. . . . Grip strength was 5/5 and upper extremity strength was 5/5. She was able to pick up small objects, button buttons, and write. . . . She had flexion of her right knee to 120 [normal is 150] degrees and the left to 139 degrees with full extension. Her knees were stable. . . . There was no tenderness or effusions present. Examination of the range of motion of the hips showed forward flexion of the right hip to 65 degrees [normal is 100] and the [left] to 85 degrees. Backward extension was normal. Abduction was 34 degrees [normal is 40] on the right and normal on the left. Adduction was normal. Her right hip had external rotation to 30 degrees, and the left was 12 degrees. Her right hip had internal rotation to 8 degrees with guarding, and the left to 23 degrees also with guarding. Strength in the lower extremities was 5/5 and she had full range of motion of her ankles. . . .
Spine: Examination of her cervical spine showed that she had decreased flexion to about 43 degrees [normal is 50], and the rest of the ROM was normal. Examination of the lumbar spine showed that she had forward flexion to 74 degrees [normal is 90] and backward extension to -14 degrees. Right and left lateral flexion was 12/18 degrees [normal is 25]. She had negative straight leg raising testing in the seated position to 90 degrees bilaterally. In the supine position SLR [straight leg raising] was to 35 degrees on the right with pain in the right lateral flank area, and 60 degrees on the left with pain in the lower back just above the buttocks area. She was able to squat only about 1/4 way. She could single-foot stand and heel/toe stand well holding onto the furniture. . . .

DIAGNOSIS:
1)      Diabetes mellitus with fair control of her diabetes. . . .
2)      Depression: She is being seen for that and is under treatment but continues to have hostile feelings. She has not continued with treatment because her psychiatrist is ill.

44

3) Low back pain without radiculopathy [nerve irritation]. She did not have any ruptured disc on the MRI exam. She does have decreased SLR [straight leg raising] in the supine position. Strength, sensory function, and reflexes are symmetrical. She does have decreased patellar reflexes.
4) Questionable asthma and bronchitis. . .
5) Chronic sinusitis with changes in her voice secondary to that.
6) Tendinitis of the right wrist. This is being treated with a wrist splint at this time.
7) Degenerative joint disease of the knees: She has decreased flexion, particularly of the right knee, but her knees are stable.

WORK RELATED ACTIVITIES: She can lift 10 lb. frequently and 20 lbs. occasionally. She can walk/stand for 3-4 hours out of 8 hours and sit for 6 out of 8 hours with the usual breaks. She has good use of her left hand for fine motor movement and only a mild deficit in using her right hand because of discomfort with flexing her fingers. This should subside as her Tendinitis resolves. She is able to travel. Her hearing and speech are good.

## C.    SUMMARY OF TESTIMONY

During the March 17, 2005, hearing, plaintiff testified; and Denise Waddell, a vocational

expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

Plaintiff testified that she lives with her husband in a single story house with a basement

(Tr. at 489-490). Plaintiff was 41 years of age during the hearing and is currently 43 (Tr. at 490).

She is 5 feet 7 1/2 inches tall and weighs 256 pounds (Tr. at 490). Plaintiff completed sixth

grade (Tr. at 491). When asked about the confusion in the record as to whether she earned a

GED, the following was said:

Q.    There was some confusion in the record that I read, Ms. McGrone, with respect to your obtaining a GED. I have some notes that say that you did get a GED, and other notes that say you did not. Did you go back to try to get a GED?

A.    Yes.

Q.    And did you succeed?

A. I succeeded with James Madison High.

Q. Explain that to me.

A. It was a paid program, and I paid to get my GED.

Q. Well, did you pay to do an examination? To test for the GED?

A. No. It was just material that they sent to me. Books and material that I --

Q. Did you then take that material and study for the GED?

A. No.

Q. Did you get any kind of a certificate that indicated that you had completed your GED?

A. Yes.

Q. And did you do anything for that?

A. Just returning the papers.

Q. So in effect, you paid money to get the certificate that said you had a GED?

A. Right.

(Tr. at 491).

Plaintiff originally claimed she became disabled on September 12, 2000[14], because that was the day she reported that she had fallen on the stairs at work (Tr. at 492). It was not actually the day she fell, because documents show that she fell in August 2000, but a few weeks later she was in so much pain she could not move (Tr. at 493). Plaintiff was treated with pool therapy (Tr. at 494).

---

[14]Plaintiff's alleged onset date was amended to February 15, 2001, based on plaintiff's earnings up to that date (Tr. at 494).

Plaintiff was still smoking a pack of cigarettes per day at the time of the hearing (Tr. at 495, 522). She had cut down from a pack and a half (Tr. at 522-523). Plaintiff was diagnosed with asthma and uses Albuterol (Tr. at 495-496). She uses her treatments four times a day, and it takes 30-40 minutes (Tr. at 523). Afterwards she is dizzy for about 45 minutes (Tr. at 523). She takes Tylenol III for pain (Tr. at 496). She also takes over-the-counter Aleve and uses a massager (Tr. at 496). Plaintiff takes Paxil for her depression, and she takes Alprazolam for anxiety (Tr. at 496-497). She takes Glucovance for her diabetes, and she just got a medication to help her sleep but she does not know what it is (Tr. at 497). The only side effect from any medication is diarrhea (Tr. at 498).

Plaintiff stated that she was in pain, and the pain from the middle of her back down to her hips was a nine on a scale of one to ten, with one being the least pain you can feel, and ten being the most pain that she could endure (Tr. at 499). The pain in her shoulders was a ten (Tr. at 499). Plaintiff has never been diagnosed with any shoulder problem (Tr. at 499).

Plaintiff's asthma is well controlled but gets worse during the pollen season (Tr. at 500). Plaintiff's most recent asthma attack was a month ago and it lasted an hour (Tr. at 500).

Plaintiff has problems with long-term memory (Tr. at 500-501). She experiences numbness in her hands and feet every two or three days, and her doctor said it was because of her diabetes (Tr. at 508). Plaintiff loses her balance quite a bit, and she has fallen in the past, most recently a month ago (Tr. at 510).

Plaintiff does not make beds or clean bathrooms at home (Tr. at 502). She sits and she lies down (Tr. at 502). She watches television most of the day while on the sofa (Tr. at 503).

47

She drives about once a week (Tr. at 503). Plaintiff plays cards for about an hour a day (Tr. at 524-525).

Plaintiff's husband works full time (Tr. at 503). His hours are from 4:00 in the afternoon until midnight (Tr. at 504). He usually gets up around 7:00 in the morning (Tr. at 504). Plaintiff and her husband eat lunch together, and he fixes the meal (Tr. at 504). Her husband does all of the house cleaning (Tr. at 504). Plaintiff does no laundry, and does dishes only sometimes (Tr. at 504). She sometimes vacuums, mops, and dusts (Tr. at 504). Plaintiff hires someone to do the yard work (Tr. at 504-505).

Plaintiff believes she could sit for an hour (Tr. at 511-512). Plaintiff can stand total for more than two hours in an eight-hour day (Tr. at 512-513). No doctor has told plaintiff she needs to lie down during the day (Tr. at 513). She is able to pick up a gallon of milk (Tr. at 513). Plaintiff has problems working with people because when they don't see things her way, she gets upset and goes and hides because she does not like to argue with people (Tr. at 514-515). She testified that she was written up at work for getting hostile with her supervisor because they did not see eye to eye (Tr. at 515). At times she has gotten into verbal confrontations (Tr. at 516). Plaintiff acknowledged that she was fired from her last job, but testified that her employer did not give her a reason (Tr. at 505).

Plaintiff has no friends because she is not a social person and never has been (Tr. at 517). When asked what kind of problems she was having that led her to seek out mental health treatment, she said, "Marital problems. Trying to get along with people. Childhood problems." (Tr. at 517). Plaintiff believes her post traumatic stress disorder is due to abuse by her mother,

48

her brother, and her sisters (Tr. at 532). She remembers her aunt hitting her with a pop bottle when she was about five or six (Tr. at 532). And one time she was whipped because she told an insurance man that her aunt was in the house, and her aunt did not want the man to know she was home (Tr. at 533).

Plaintiff brought a cane with her to the hearing (Tr. at 518). She testified she has used it every day since 2001, even in her house (Tr. at 518). The cane helps her with balance (Tr. at 519). Plaintiff does not sleep at night, and she may sleep for about four hours during the day (Tr. at 519-520). If she is worried, that keeps her awake, and lately she has been having bad dreams which make her afraid to go to sleep (Tr. at 520). She has been dreaming about snakes (Tr. at 520). When she has gone without sleep, she will sometimes hear people talking to her (Tr. at 520).

On bad days, plaintiff does not bathe or dress, she stays in bed and only gets up to go to the bathroom (Tr. at 521). She has about five bad days per week (Tr. at 521). On a good day, her husband will take her out to a restaurant to get barbeque, they may go to the park to walk around (Tr. at 521). She has no problems when she is out at restaurants or the park (Tr. at 521-522).

**2.      Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge. The vocational expert testified that plaintiff has transferrable skills from her housekeeper's job[15], which would be compiling data (Tr. at 528).

---

[15]Plaintiff testified that she scheduled the housekeepers to clean certain rooms.

The first hypothetical involved a person who could lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk for two hours; sit for six hours; had an unlimited ability to push or pull; could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; could never climb ladders; and should avoid concentrated exposure to heat and cold (Tr. at 528). The vocational expert testified that such a person could not perform plaintiff's past work (Tr. at 528). However, such a person could be a records clerk, with 110,000 jobs in the nation; a production checker, with 32,200 jobs in the nation; an information clerk, with 30,500 jobs in the nation; a semi-conductor assembler with 85,000 jobs in the nation (Tr. at 529).

The second hypothetical included the first but also limited the person to simple repetitive tasks with limited contact with the public and co-workers (Tr. at 529). The vocational expert testified that such a person could be a production checker and a semi-conductor assembler (Tr. at 530).

The third hypothetical included the second, except the person would routinely respond inappropriately to supervisory correction or co-worker confrontation (Tr. at 530-531). The vocational expert testified that because of "routinely" having difficulty responding to supervisors' criticisms, the person could not work (Tr. at 531).

The fourth hypothetical involved a person who, due to a sleep disorder, would miss two or more days of work per month (Tr. at 531). The vocational expert testified that such a person could not work (Tr. at 531).

Finally, the last hypothetical involved a person who had to lie down four hours during the day, and the vocational expert testified that such a person could not work (Tr. at 531).

## V.   FINDINGS OF THE ALJ

On March 25, 2005, Administrative Law Judge Guy Taylor entered the final decision finding plaintiff not disabled (Tr. at 23-31).  The ALJ found that plaintiff has past relevant work experience as a home health aide, medical technician, light cleaner, and housekeeper (Tr. at 24).

At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 24).  At steps two and three, he found that plaintiff suffers from depression, anxiety, obesity, a history of back pain and strain, asthma, and diabetes, which combine to equal a severe impairment, but do not meet or equal a listed impairment (Tr. at 25).

The ALJ analyzed plaintiff's testimony and found her to be not credible (Tr. at 25-26). He found that plaintiff retains the residual functional capacity to lift ten pounds frequently and 20 pounds occasionally; stand and walk for at least two hours per day; sit for at least six hours per day; perform unlimited pushing and pulling; and occasionally crawl, crouch, climb, kneel, stoop, and balance (Tr. at 28).  Due to her depression, she can only perform simple, routine, repetitive work, and she can have only limited contact with the public or her co-workers (Tr. at 28).  The ALJ then found at step four that plaintiff cannot return to her past relevant work (Tr. at 28).

At step five, the ALJ found that plaintiff can perform the jobs of production counter and semi-conductor assembler, both of which exist in significant numbers in the economy (Tr. at 29). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

Case 4:05-cv-01197-REL   Document 19   Filed 01/22/07   Page 51 of 71

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security

52

Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> When asked by the undersigned to rate her pain on a scale of one to ten where one represents pain that can barely be felt and ten represents pain that would be unbearable, the claimant described her pain from her mid-back to her hip as a "9-10." She also alleged pain in her shoulders and described that pain as a "10." She also alleged numbness in her feet and hands and described difficulty with reaching, grasping and cold intolerance. She stated that she has balance problems and occasionally falls; alleging she fell down a month prior to the hearing. She also alleged that she has asthma for which she uses an inhaler and a breathing machine; but, she acknowledged she continues to smoke cigarettes. She described her activities of daily living by testifying she occasionally tries to do household chores such as cooking, cleaning and laundry. She watches television several hours per day and plays cards one hour per day. She alleged she spends her day either sitting or laying [sic] down. She also testified she gets most of her sleep during the day; alleging she is afraid to go to sleep at night because of bad dreams. She described limited physical abilities, testifying she cannot stand or walk more than five minutes at a time or more than two hours total per eight-hour day. She further alleged when she goes shopping she uses a motorized cart. She stated she has mental and emotional impairments, describing depression, memory loss, social isolation, difficulty getting along with others, excessive worry and intrusive memories of the past. . . .

> . . . [C]laimant alleges both physical and mental problems and associated disabling symptoms and limitations. However, the medical evidence demonstrates that these complaints are exaggerated, at least to the extent that claimant alleges these problems prevent her from performing at least some light work that would reasonably accommodate her impairments. Specifically, although claimant alleges severe back pain, there is limited recent evidence of record documenting this impairment. A June 2004 MRI showed only minimal degenerative findings in the spine. Earlier treatment notes described normal range of motion with only moderate muscle spasms in the back. In addition, claimant acknowledged at the hearing and in the record that she is able to sit for prolonged periods. She also testified at the hearing that she plays card[s] one hour a day and watches television several hours per day which suggests at least an adequate level of concentration.

> Claimant complained of other mental and emotional impairments, particularly depression. However, there are inconsistencies of record suggesting that claimant has exaggerated the extent of her depression. Specifically, a March 2004 treatment note described intact levels of activities of daily living, social interaction, and concentration,

53

persistence and pace, suggesting claimant is quite capable of a high level of functioning. . . .

Earlier treatment notes state that while claimant was having marital conflict with depression with low self esteem, she also considered getting a GED so that she could secure employment and become financially independent. She was given global assessment of functioning scores of 50-60, representing a mild to moderate impairment in functioning. Treatment notes further state she was progressing well with psychotherapy and medication, all of which strongly suggests claimant was not permanently disabled due to mental and emotional impairments; but, instead, was enduring some situational issues which were solvable; and, in fact, were resolved with a GED. There is some suggestion in the record of a post traumatic stress disorder but claimant testified at the hearing this was due to being beaten by an aunt when she was five or six years old for failing to properly recite the alphabet. She also stated that at about this same time this same aunt rapped her knuckles with a coke bottle. The underlying treatment notes, however, state claimant's main mental and emotional impairment is depression which has resolved as stated above with no indication of serious disability due to post traumatic stress disorder. In addition, claimant was able to function for years after the alleged abuse suffered as a small child which is further indication that she is not having significant post-traumatic stress symptoms.

There is also no evidence that claimant suffers any significant or disabling adverse side effects of medication. Further, claimant has a work history characterized by a number of job changes and fluctuating earnings, suggesting claimant is not highly motivated for long-term, permanent employment.

(Tr. at 25-27).

## 1. PRIOR WORK RECORD

The record is full of statements regarding plaintiff's refusal to work in order to force her husband to pay their family bills. On August 1, 2000, when plaintiff was still employed, she told Dr. Fayne that at times she does not go to work, and that she feels if she does not work then her husband will have to pay the bills. Later that month she told Dr. Fayne that she works extra hours to make more money, then her husband drops more bills on her to pay. On October 2, 2000, she said she misses work to get even with her husband. On January 29, 2002, Dr. Fayne

Case 4:05-cv-01197-REL   Document 19   Filed 01/22/07   Page 54 of 71

wrote that plaintiff was angry with her husband and had "no intention of working. Her plan is to make him support her." The same thing appears in Dr. Fayne's February 12, 2002, notes.

On March 12, 2001, plaintiff told Dr. Fayne she was laid off from her job due to poor health. On April 11, 2002, plaintiff said she was fired from her last job due to poor participation. On October 1, 2004, she said she was fired from her job because she had to leave early one day. She testified at the hearing that she was fired from her last job but her employer never gave her a reason.

The record regarding plaintiff's prior work record shows that she used her absence from work as a way to get back at her husband, a person toward whom she holds a lot of anger. This raises serious questions about her credibility, and certainly detracts from her claim that she does not work because of her impairments as opposed to some other reason.

## 2.    *DAILY ACTIVITIES*

Plaintiff told Dr. Schwartz, whom she saw in connection with her disability application, that her husband does the dishes, the laundry, the grocery shopping. She told Dr. Majure-Lees, also in connection with her disability application, that she pays people to do her house cleaning and laundry. She testified at the hearing that her husband does all the house cleaning and laundry.

Yet, plaintiff complained for years to Dr. Fayne about her husband's lack of help around the house. On June 19, 2001, she said that her husband does not participate in the care of the home, the cleaning, the cooking, preparing food. On August 1, 2002, she said that her husband does not clean up after himself like she does. On August 13, 2003, she complained that her

55

husband was not cleaning up after himself, putting things back where they belong, putting his tools in the proper places.

Dr. Vaughan's report states that plaintiff said she eats out of a lot, shops for clothes, and irons her husband's uniforms. She complained to Dr. Fayne that her social outlets were limited, and her husband would not dress appropriately to take her out. On June 5, 2001, she again complained that her husband's life was boring and he would not take her out, so she had begun going out with friends and family. Plaintiff said in July 2002 that she was trying to get things more organized in her home.

On January 8, 2004, Dr. Fayne noted that plaintiff's activities of daily living were adequate. On April 7, 2004, he found that her activities of daily living were adequate.

The record on this factor supports the ALJ's credibility finding. Plaintiff attempted to persuade those connected with her disability application that her husband helped her tremendously, doing all of the shopping, cleaning, cooking, laundry. Yet, one of her main complaints for years to her psychiatrist was that her husband did little to help around the house and left those things for her to handle.

## 3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Plaintiff testified at the hearing that the pain in her back was a nine or a ten, with ten being unbearable pain, and that her shoulder pain was also a ten, unbearable. The medical records do not support such allegations. Plaintiff even admitted that she has never been diagnosed with any shoulder problem.

56

On January 3, 2001, plaintiff saw Dr. McKeel about her diabetes, and said that she felt well otherwise and had no particular problems. On March 3, 2001, plaintiff was seen at St. Luke's Hospital and was found to have "painless range of motion" in her back. On May 10, 2001, she saw Dr. McKeel for diabetes and said that other than having diabetes she felt fairly well.

On February 12, 2002, Dr. Fayne noted that plaintiff had been "nursing a back injury" for the past four months; however, there are no medical records for that time during which plaintiff sought any treatment for that alleged back injury. She also admitted to Dr. Fayne that she had not sought any treatment for her back. Dr. Fayne concluded that plaintiff was using her back as an excuse not to work, and if her back improved she would have to "get out and do something." Dr. Latkovich noted in October 2002 that plaintiff never made an appointment with a pain specialist as had been recommended. Plaintiff had come in asking for hydrocodone, a narcotic, and Dr. Latkovich refused to prescribe it. Plaintiff told Dr. Majure-Lees in October 2002 (and in connection with her disability case) that she had been using a cane daily since 2001. Yet in March 2002, plaintiff saw Dr. Majure-Lees after her previous application for disability benefits, and Dr. Majure-Lees observed that plaintiff's gait was normal without assistive device. In May 2002, Dr. Lapietra observed that plaintiff's gait was normal and there is no mention in that record of plaintiff having used a cane.

Dr. Vaughan noted that plaintiff did not allege any psychological complaints in her administrative forms. On August 15, 2002, Dr. Fayne, a psychiatrist, remarked that plaintiff was not working due to a back injury, not because of any psychological issues.

57

The records on this factor support the ALJ's credibility determination. Although plaintiff alleges unbearable pain in her back and shoulders, she was never seen for shoulder pain, she was never diagnosed with shoulder pain, and she was never given anything but minor pain medication for her back. Plaintiff was told to go to a pain clinic, a recommendation she did not follow up on. Plaintiff's pain simply could not have been unbearable for years given the minor treatment she received and the lack of medical records dealing with these impairments.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

The record establishes that plaintiff married a man 24 years her senior, had an extramarital affair, was caught by her husband who then became emotionally cold in his relationship with plaintiff. Plaintiff then became angry with her husband because he did not give his paycheck to her, he did not buy her gifts to make her feel important, and he did not consult with her before making purchases. Plaintiff began choosing not to go to work in order to get back at her husband. She alleged back problems as a way to avoid working and thereby getting back at her husband. She told Dr. Fayne that she wanted to stay in her marriage because she felt that her husband, being so much older than she, may die and leave her well off. Dr. Fayne stated again and again that plaintiff's poor marriage was exacerbating her depression. He recommended that plaintiff get her GED, go to college, and get a job so that she would feel better about herself and open up new choices for her life rather than remaining financially dependent on her husband with whom she did not get along. Every single visit to her psychiatrist was precipitated by marital arguing, and almost every marital argument revolved around money. Dr. Fayne even stated that if he could get plaintiff's family stabilized, her depression would be diminished (Tr. at 328). He

58

also stated that plaintiff's marital problems were contributing to her depression. On January 8, 2004, plaintiff reported that things were better with her husband, and Dr. Fayne observed that plaintiff was in much better spirits and feeling better about herself.

Plaintiff's sleep problems were the result of her choosing to sleep during the day in order to avoid her husband. Her psychiatrist recommended on several visits that plaintiff try to sleep during the night and stay up during the day. Plaintiff never told a treating physician that she had any sleep problems other than this conscious choice to sleep all day to avoid interacting with her husband. She only mentioned nightmares and other sleep difficulties to consulting physicians or those she saw directly in relation to her disability application.

Dr. Fayne discussed plaintiff's elevated blood sugars and the relationship of uncontrolled diabetes to mood swings. Despite the fact that plaintiff was told her diabetes could exacerbate her mood swings, she refused to adhere to a diabetic diet and most of the time refused to take her medication as prescribed, allowing her medication to run out for weeks at a time before contacting a doctor for a refill or for samples. Dr. Fayne told plaintiff to stick to her diet and try to lose six to eight pounds per month for the next year, reminding her that working on her weight would improve her overall feeling of self-worth. Plaintiff remained unmotivated to lose weight, even though it would greatly help her in controlling her diabetes and it would also help in her feeling of self-worth.

Dr. Fayne noted that when plaintiff began spending time on her computer and began learning more about computers, she felt good about herself.

59

The only precipitating or aggravating factor in this record is plaintiff's decision to stay in a destructive marriage in the hopes that she will one day soon become a financially secure widow. Plaintiff's medical records are almost all comprised of marriage counseling. Plaintiff has chosen not to comply with the recommendations of her doctors -- to lose weight, to stick to a diabetic diet, to take her medications as prescribed, to further her education in computers, and to get a job so that she feels good about herself and is able to make better life choices. The records do not support plaintiff's allegations that functional abilities relating to performing work precipitate or aggravate her impairments.

## 5.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The record establishes that most of the time, plaintiff is not compliant with her doctors' prescriptions and recommendations. On January 3, 2001, plaintiff told Dr. Fayne she had been out of her medications for at least a week. On April 3, 2001, Dr. Fayne noted that plaintiff had been out of her medications for two weeks, despite him having asked her previously if she had enough medication. On August 28, 2001, Dr. McKeel noted that plaintiff had not taken her diabetes medications for the past seven to ten days. On October 14, 2002, Dr. Latkovich noted that plaintiff had run out of her diabetes medication two weeks ago but had not bothered to call for a refill, and she had been out of her inhalers for a while.

On January 3, 2001, Dr. Fayne told plaintiff she needed to stick to a strict diabetic diet. On January 24, 2001, Dr. McKeel noted that plaintiff was not compliant with her diabetic diet. On May 10, 2001, Dr. McKeel noted that plaintiff was not compliant with her diet. On January 15, 2002, Dr. Fayne noted that plaintiff needed to follow her diet. On May 22, 2002, Dr.

60

Lapietra noted that plaintiff was not following her diet. On July 16, 2002, Dr. Franks noted plaintiff was not compliant with her diabetic diet. On February 11, 2004, Dr. Marshall noted that plaintiff was not following her diet.

On January 23, 2001, Dr. Fayne noted that none of plaintiff's psychiatric medications were causing side effects. On February 12, 2002, plaintiff told Dr. Fayne she was having no side effects from her medication. Plaintiff testified that only side effect she has from any medication is diarrhea.

On March 14, 2002, plaintiff told Dr. Majure-Lees that her asthma was controlled with medication.

On September 5, 2003, Dr. Fayne noted that plaintiff was finally taking her medication on a regular basis which she had not been doing in the past. Plaintiff was much better spiritually and her tolerance for stress was better. On April 7, 2004, Dr. Fayne noted that plaintiff's medication was helping keep all her mental issues under control. He listed those issues as cognitive function, memory, concentration, focus, forgetfulness, irritability, mood swings, and anger management. Plaintiff told Dr. Schwartz, a psychologist, in October 2004 that her medications were helping her.

On October 16, 2003, Dr. Marshall prescribed only a muscle relaxer, over-the-counter anti-inflammatory, and back exercises for plaintiff's back pain.

Plaintiff told Dr. Glass in September 2004 that her right hand had hurt for two years and she was wearing a brace. However, there is no record wherein plaintiff complained of right hand pain and was told to use a brace.

The evidence establishes that plaintiff's psychiatric medications work when she takes them, and they give her no side effects. Her asthma is controlled on medication despite her continued smoking. Plaintiff's back pain has never required strong pain medication.

This factor supports the ALJ's credibility conclusion.

**6.      FUNCTIONAL RESTRICTIONS**

Dr. Fayne wrote a letter excusing plaintiff from work from January 25, 2001, through February 10, 2001, "due to the flu", not due to any psychiatric impairment. He released her to return to work on February 10, 2001. However, plaintiff's alleged onset date of disability is February 15, 2001, when she stopped working.

Plaintiff was seen on March 3, 2001, at St. Luke's Hospital in connection with her worker's compensation claim, and the doctor there released her to return to work with only lifting restrictions and told her to follow up with another doctor as needed.

Dr. Majure-Lees noted in 2002 that plaintiff was able to get on and off the exam table without difficulty, her gait was normal without assistive device, she moved somewhat slowly when entering the exam room but once the exam was over, she walked much more briskly. She found that plaintiff could carry ten to 15 pounds frequently (and based this on the weight of plaintiff's purse), that she could lift 20 pounds occasioning, and had no limits in the use of her hands. The limitations she found with sitting, standing and walking were a mirror image of what plaintiff had alleged to Dr. Majure-Lees -- can walk for five minutes at a time, needs to alternate her position after sitting for 15-20 minutes, and can stand for ten to 15 minutes at a time. Plaintiff later admitted that she can sit for long periods of time despite what she told Dr. Majure-

62

Lees during this exam.

On February 11, 2004, Dr. Marshall recommended that plaintiff do regular aerobic exercises. Although plaintiff had a brace on her wrist and used a cane when she visited Dr. Schwartz in connection with her disability application, no doctor had ever recommended that she use either. In October 2004, Dr. Majure-Lees noted that plaintiff had a cane but did not really bear any weight on it and had only occasional limping, not a consistent limp. Dr. Majure-Lees found that plaintiff could lift ten pounds frequently, 20 pounds occasionally, walk or stand for three to four hours, and sit for six hours. She found that plaintiff had only a mild deficit in using her right had due to her "tendinitis" but that should subside as her tendinitis resolves. However, there are no records of any treating physician diagnosing tendinitis and recommending that plaintiff wear the wrist brace she had on when she saw Dr. Majure-Lees[16].

Plaintiff admitted during the hearing that no doctor has told her that she needs to lie down during the day. She testified that she could sit for an hour at a time, she can stand for a total of two hours per day, and she can lift a gallon of milk (which weighs eight pounds). She also testified that she goes to restaurants with her husband and walks in the park with him, and has no problems doing either.

In April 2002, Dr. Vaughan found that plaintiff had only mild mental restrictions. In August 2002, Dr. Sullivan found that plaintiff was not significantly limited in any mental abilities

---

[16]Dr. Glass did assess tendinitis; however, that diagnosis was based on plaintiff's statement that she had tendinitis, had had it for two years, and had worn a wrist brace frequently. Dr. Glass did not base that diagnosis on any tests. She had also seen plaintiff twice before that visit, and no mention was made of plaintiff having wrist pain or wearing a brace.

other than her ability to understand and remember detailed instructions. She found that plaintiff could succeed at tasks of low skill in a less stressful environment. Dr. Schwartz found that plaintiff basically had no mental limitations other than those dealing with post traumatic stress disorder. This, of course, was based solely on plaintiff's allegations to Dr. Schwartz that she is afraid to close her eyes because of dreams, she sleeps only three hours out of 24, she believes people are out to get her, she hears voices when she is alone, she has daily nightmares and flashbacks about sexual abuse as a child. None of these allegations appear in any of the treatment records of plaintiff's treating psychiatrist. Therefore, Dr. Schwartz's findings regarding plaintiff's post traumatic stress disorder issues are not well supported.

On April 7, 2004, Dr. Fayne, in a form related to plaintiff's disability application, found that plaintiff had no ability or poor ability in all 20 mental abilities related to employment. He found that she had no ability to relate to co-workers, even though he had encouraged her over and over and over to go to school to finish her GED program, and then to enroll in college or vocational school. He found that she had a poor ability to use judgment, even though on four different occasions before completing this form Dr. Fayne had found plaintiff's judgment to be adequate. He found that she had a poor ability to maintain attention and concentration, yet his records reflect that plaintiff was doing well with her GED studies and that she earned her GED with honors. In addition, he encouraged her to go to college and described her as a "very bright woman". He found that she had a poor ability to understand, remember, and carry out simple job instructions, yet his records reflect that plaintiff had developed budgets and other programs on her computer and was becoming knowledgeable about computers. In addition, she was able

64

to use a palm pilot to keep track of her medications. He found that plaintiff had a poor ability to maintain personal appearance, yet in almost every record he noted that plaintiff's appearance and grooming were adequate. The only time Dr. Fayne ever performed a mental status exam was in August 2000 on plaintiff's first visit. Every other treatment record over the years consisted of marital counseling and career advice. There simply is nothing in Dr. Fayne's treatment records to support these restrictions.

The record establishes that the only credible restrictions ever placed on plaintiff are minor. This factor supports the ALJ's credibility conclusion.

## B.    CREDIBILITY CONCLUSION

The Polaski factors discussed above clearly support the ALJ's credibility analysis and conclusion. I note also that plaintiff told Dr. Fayne that she had a "life-long history of explosive temper and impulsivity", yet despite these life-long qualities, plaintiff was able to engage in substantial gainful activity for years. Plaintiff worked for months while she was being treated by Dr. Fayne, and there is nothing in his or any other doctor's notes that explain why plaintiff was no longer able to work the following February. Plaintiff told the doctor at St. Luke's Hospital that her back pain began "while lifting at work". She told other doctors her back pain was a result of falling on the stairs.

Plaintiff continues to eat only one meal per day which is contrary to a standard diabetic diet, she failed to follow up with a dietician as recommended on several occasions, she was repeatedly described as not following a diabetic diet, she continued to smoke despite having asthma and diabetes, she repeatedly let her medications run out, she was often described as non-

Case 4:05-cv-01197-REL    Document 19    Filed 01/22/07    Page 65 of 71

compliant with medication and diet, she was unmotivated to lose weight which had been recommended in connection with her depression and her diabetes.

The record also establishes that plaintiff either exaggerated or fabricated symptoms when talking to doctors associated with her application for disability benefits. She told Dr. Schwartz that she was not able to concentrate and study for her GED. Yet she had told Dr. Fayne regularly for months that she was studying for her GED, she was doing well, she only had trouble on the math section, and then that she earned her GED with honors. She told Dr. Schwartz that she had trouble being around other people, yet she told Dr. Fayne many times that she was frustrated with her husband because they had no social life, he did not dress appropriately when they went out, and that she had started going out with her friends and family since her husband would not take her. She told Dr. Schwartz that she had no goals in her life, but she talked repeatedly to Dr. Fayne about finishing her GED and then going to college to get a degree in computers. She told Dr. Schwartz that she is afraid to go to sleep because she has dreams and only sleeps three hours per day. Yet she told Dr. Fayne that she sleeps 12 to 15 hours per day, mostly to avoid interacting with her husband. She told Dr. Majure-Lees that she had been using a cane for years on a daily basis, yet no treating physician ever recommended a cane or noted that plaintiff used a cane.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

66

## VII.  HYPOTHETICAL

Plaintiff argues that the ALJ improperly relied on the testimony of the vocational expert because the hypothetical question did not incorporate all of plaintiff's limitations, namely, the routine inappropriate responses to supervisory correction due to major depression and post traumatic stress disorder, the two or more days of missed work per month due to a sleep disorder, the need to lie down for four hours each day, the deficit in using her right hand, and the asthma treatments which take 30 minutes to one hour four times per day.

### A.  *Routine inappropriate responses to supervisory correction.*

Plaintiff argues that the evidence shows she would routinely have inappropriate responses to supervisory correction due to major depression and post traumatic stress disorder.  Plaintiff's treating psychiatrist did not diagnose her as having post traumatic stress disorder.  Dr. Fayne, in August 2000 at plaintiff's first visit, diagnosed anxiety disorder with post traumatic stress disorder issues.  This was based on plaintiff's having been in foster care as a child and then being treated for running away behavior.  In October 2004, while plaintiff was being examined in connection with her disability application, she told Dr. Schwartz that an uncle sexually abused her as a child, and that she currently was having nightmares and flashbacks about it daily.  He mentioned post traumatic stress disorder symptomatology as explaining her fear of being around people.  As discussed above, this is not credible in that plaintiff never told her treating psychiatrist that she had flashbacks or nightmares, she never told her treating psychiatrist that she had a fear of being around people, and in fact she told her treating psychiatrist that she wanted to go out but her husband wouldn't take her.

67

On April 9, 2002, Dr. Vaughan found that plaintiff was only moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. That was based on his belief that plaintiff was be exceptionally angry about having to go work, due to her statements to Dr. Fayne that she was going to get back at her husband by not working. On August 21, 2002, Dr. Sullivan found that plaintiff was not significantly limited in the ability to accept instructions and respond appropriately to criticism from supervisors. Neither of those doctors believed that plaintiff was unable to work.

As discussed at length above, Dr. Fayne repeatedly encouraged plaintiff to go to college to get a degree in computers so that she could get a well-paying job, become financially independent, and have more choices in life. Clearly going to college would involve plaintiff taking criticism from instructors. If Dr. Fayne really believed that plaintiff could not adequately handle correction from supervisors, it is implausible that he would encourage plaintiff to put herself in a position of accepting criticism from college professors.

**B.      *Two or more days of missed work per month due to sleep disorder.***

Plaintiff claims that she would miss two or more days of work per month due to a sleep disorder. As discussed at length above, there is no evidence that plaintiff suffered from a sleep disorder. Plaintiff told her doctor she slept during the day to avoid interacting with her husband. She was told to sleep at night and stay up during the day. She was even prescribed Trazodone to help her sleep at night. There is no evidence that plaintiff would be fatigued from not sleeping if she would take her doctor's advice and sleep at night, taking her medication as prescribed. Instead, the overwhelming evidence is that for the most part plaintiff was noncompliant with

taking her medications and she continued to sleep during the day against her doctor's advice due to marital difficulties.

**C.** *The need to lie down for four hours per day.*

Plaintiff testified that she lies down for four hours per day; however, she also admitted during the hearing that no doctor has ever told her she needs to lie down. The record establishes that plaintiff tried to sleep during the day in order to avoid interacting with her husband. Dr. Fayne told plaintiff to stop doing that. He told her to sleep at night and stay up during the day. There is no evidence at all to support plaintiff's allegation that she needs to lie down during the day.

**D.** *The deficit in using her right hand.*

Plaintiff argues that Dr. Majure-Lees found that plaintiff's tendinitis would cause a deficit in using her right hand.

Plaintiff saw Dr. Majure-Lees in connection with her disability application. On exam, plaintiff had full range of motion of her wrists except for palmer flexion of her right wrist at 50 degrees (normal is 60); she was able to extend her fingers, oppose them, and make a fist; grip strength was 5/5 and upper extremity strength was 5/5; she was able to pick up small objects, button buttons, and write. "She has good use of her left hand for fine motor movement and only a mild deficit in using her right hand because of discomfort with flexing her fingers. This should subside as her Tendinitis resolves."

Dr. Majure-Lees's finding that plaintiff had a "mild deficit" which would subside as the tendinitis resolves was based on (1) plaintiff claiming to have pain in her hand, and (2) plaintiff's

statement that Dr. Glass had diagnosed tendinitis. Dr. Glass had indeed diagnosed tendinitis the month before, but that diagnosis was based solely on plaintiff's statement that she had experienced pain in her hand for two years and frequently wore a brace. In fact, plaintiff had never complained to any doctor of hand pain and had never been observed wearing a brace before. No doctor ever recommended that plaintiff wear a brace on her wrist.

The diagnosis of tendinitis is based on no medical tests whatsoever. Dr. Majure-Lees believed that plaintiff's "mild deficit" in the use of her right hand would go away as the tendinitis got better. In addition to the fact that the diagnosis of tendinitis is not credible as it is based on nothing but plaintiff's allegations not for treatment but in the throes of her quest to secure disability benefits, the described limitation is only a "mild deficit". This is not inconsistent with the residual functional capacity determined by the ALJ.

E.    *Asthma treatments taking 30 to 60 minutes four times per day.*

Plaintiff testified that her asthma treatments take 30 minutes to one hour, and she uses these treatments four times per day. The record, however, establishes that plaintiff continued to smoke a pack of cigarettes or more per day despite having been warned by all of her doctors to stop. She was described as not being motivated to stop smoking and not being interested in trying to stop.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

70

Because plaintiff continues to smoke against her doctor's advice, and she has failed even to try to stop smoking, she cannot rely on her asthma as a basis for disability.

A hypothetical question is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004). Because the impairments claimed by plaintiff to have been omitted from the hypothetical were not found credible by the ALJ, and because the substantial evidence in the record as a whole supports that finding, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 22, 2007

Case 4:05-cv-01197-REL   Document 19   Filed 01/22/07   Page 71 of 71